Argued and submitted November 21, 1997, affirmed April 1, 1998

In the Matter of the Compensation of
Michael D. Wingo, Claimant.

Michael D. WINGO,
*Petitioner,*

*v.*

DPR CONSTRUCTION
and SAIF Corporation,
*Respondents.*

(WCB 96-01814; CA A96019)

956 P2d 1005

James S. Coon argued the cause for petitioner. With him on the briefs was Susan Dobrof.

David Runner argued the cause and filed the brief for respondents.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

Armstrong, J., dissenting.

## EDMONDS, J.

Claimant seeks review of an order of the Workers' Compensation Board denying him payment of temporary total disability (TTD) benefits. He assigns error to the Board's application of *former* OAR 436-60-030(11)(b)[1] to the facts of this case in arriving at its conclusion that he is not eligible for TTD. We review the Board's decision for errors of law and substantial evidence, ORS 183.482(8)(a) and (c), and affirm.

The material facts are not in dispute. Claimant was a member of a carpenter's union and was dispatched by the union to employer in September 1995. Claimant suffered a compensable injury on October 2, 1995, but did not claim any TTD because employer provided him with a light-duty job and continued to pay him the same wage as before the injury.

While claimant was continuing to work for employer, the union notified him that he was in arrears in his union initiation fees and dues. The union and claimant agreed that claimant would pay $50 per week to catch up with his obligations. When claimant failed to make a payment in accordance with that agreement, the union's business manager wrote a letter to employer on December 13, 1995, requesting that employer remove claimant from its employ in accordance with the labor agreement between employer and the union.[2] Employer's representative received the letter on December 20 and attempted to verify claimant's status with the union on that day. On December 21, the union's business agent[3] confirmed that the information in the

---

[1] The parties agree that *former* OAR 436-60-030(11)(b) (1995) is the rule under which this case is to be resolved.

[2] The contract provided, in part:

"*Section 9.* All requests by the Union for removal of an employee for non-payment of or failure to tender initiation fees and or dues or for improper dispatch shall be made to the employer in writing. The Employer then agrees to terminate the employee no later than the end of the next shift following Employer's receipt of the Union's request for such termination, provided the Union supplies, upon request, a replacement within the same period."

[3] The business manager and business agent are different individuals. The business manager dealt with claimant regarding union dues, while the business agent was the union official who had contact with employer.

letter was correct, and employer immediately terminated claimant's employment.

Unbeknownst to employer, claimant had brought his union dues current as of December 19, 1995. On December 22, after claimant had been terminated, the union's business manager wrote a second letter to inform employer that claimant was "no longer in violation of the Agreement" and was cleared "to return to work at [employer's] discretion."[4] However, employer declined to reemploy claimant.

After he was fired, claimant filed a claim for TTD, which employer denied. The administrative law judge (ALJ) concluded that claimant was eligible for TTD payments because his physical condition prevented him from working at his regular job and his modified, light-duty job no longer existed.[5] Employer appealed the ALJ's decision, and the Board reversed, concluding that "[b]ecause claimant was fired in accordance with the labor agreement with his union, * * * claimant's termination was for violation of a normal employment standard."

ORS 656.268 provides, in part:

"(3)   Temporary total disability benefits shall continue until whichever of the following events first occurs:

"* * * * *

"(c)   The attending physician advises the worker and documents in writing that the worker is released to return to modified employment, such employment is offered in writing to the worker and the worker fails to begin such employment[.]"

---

[4] A handwritten note on the bottom of the second letter said, "Arrangements had already been discussed between [the business manager] and [claimant]. Removal was sent in error."

[5] In arriving at that conclusion, the ALJ explained:

"[Claimant's] termination resulted from the terms of the employer's labor agreement with claimant's union. The termination did not result from claimant's violation of a normal employment standard. * * * Here, claimant was separated from his employment for reasons unrelated to his job performance or conduct. Although employer has no obligation to pay claimant temporary disability benefits during a period of time when it is contractually prohibited from employing claimant, once the conditions that lead to claimant's termination were lifted, and where, as here, the job no longer existed or the job offer was withdrawn, temporary disability benefits are due."

*Former* OAR 436-60-030(11)(b) was promulgated pursuant to ORS 656.268(3)(c) and provided:

"(11)  Temporary partial disability compensation paid under subsection (10) shall continue until:

"* * * * *

"(b)  The job no longer exists or the job offer is withdrawn by the employer. This includes, but is not limited, to termination of temporary employment, layoff or plant closure. A worker shall be included in this subsection who has been released to and doing modified work at the same wage as at the time of injury from the onset of the claim. The worker is entitled to temporary total disability compensation as of the date the job is no longer available. For purposes of this rule, a worker *quitting the job or the employer discharging the worker for violation of normal employment standards is not a withdrawal of a job offer, but shall be considered the same as the worker failing to begin employment pursuant to ORS 656.268(3)(c).*" (Emphasis supplied.)

■■■ On review, claimant does not challenge the validity of the rule but argues that the "violation of a normal employment standards" provision of the rule is inapplicable to the facts underlying his claim. He explains that, "He was, in fact, *not* in violation of any normal employment standard on the day he was discharged." (Emphasis in original.) The first question raised by claimant's argument is whether, as a matter of law, a discharge for failure to pay union dues in accordance with a labor agreement is a discharge for "violation of normal employment standards" within the meaning of the rule. In interpreting a statute or an administrative rule, our task is to ascertain the intent of the body that promulgated it. *Perlenfein and Perlenfein,* 316 Or 16, 20, 848 P2d 604 (1993). We begin with the text and the context of the regulation. *Bartz v. State of Oregon,* 314 Or 353, 357, 839 P2d 217 (1992). The text of the rule provides that when an injured worker who is performing modified work at the same wage as before the injury is discharged for violating a normal employment standard, that worker is to be regarded as ineligible for TTD payments in the same way as an injured worker who was offered modified employment but failed to begin it under ORS 656.268(3)(c). Our cases construing the statute under

which the rule is promulgated are therefore instructive in determining the meaning of the rule.

In *Safeway Stores, Inc. v. Hanks*, 122 Or App 582, 857 P2d 911 (1993), the employer locked the claimant out of the workplace during a labor dispute. There was no evidence that the claimant's separation from employment was due to her voluntary choice. *Id.* at 585. The Board concluded:

> "The unilateral termination provisions in ORS 656.268-(3)(c) are based on the premise that the client is or *could be* working. Here, claimant is physically unable to perform her regular work, and the offer of modified employment has been temporarily withdrawn. Through no fault, or choice of her own, claimant is unable to work, as a result of her injury." *Id.* (Emphasis in original.)

We upheld the Board's construction of ORS 656.268(3)(c) and its determination that the claimant was eligible for temporary disability benefits during the period of time that she could not work due to the employer's election to lock her out of the workplace.

In *Hanks*, we distinguished two cases in which we held that the claimant was not eligible for TTD. In *Roseburg Forest Products v. Wilson*, 110 Or App 72, 821 P2d 426 (1991), we upheld the employer's termination of TTD because the claimant, who was offered modified work, refused to cross a picket line due to a strike at the job site. In *Roseburg Forest Products v. Phillips*, 113 Or App 721, 725, 833 P2d 1359, *rev den* 314 Or 727, 843 P2d 454 (1992), we held that the employer was not required to begin the payment of TTD because the claimant "withdrew from the work force when he decided to participate in the strike." We concluded in *Hanks* that, "Unlike in [*Wilson* and *Phillips*], claimant did not withdraw from the work force. The separation resulted from employer's action."

We conclude that when the legislature authorized employers to terminate TTD payments under ORS 656.268-(3)(c) if "the worker fails to begin [modified] employment," it intended the statute to apply when the failure was the result of the conduct of the worker. Because OAR 436-60-030(11)(b) was promulgated in accordance with the provisions of the statute and expressly directs that a discharge for violation of

normal employment standards be treated in the same manner, we conclude that the rule likewise focuses on the conduct of the worker.

In this case, a valid labor agreement existed between employer and the union. According to the labor agreement, employees were required to be members in good standing of the union, which included paying union initiation fees and dues in a prescribed manner. The labor agreement required employer to discharge employees when the union informed it that the employee had not paid union dues as prescribed. We conclude on these facts that the maintenance of union membership, including payment of dues, was a "normal employment standard" that was applicable to claimant. *See Amuchastiegui v. Dep't of Employment*, 4 Or App 456, 457-58, 479 P2d 526 (1971) (holding that the voluntary failure to pay union dues that resulted in termination of employment pursuant to a collective bargaining agreement constituted the employee's "voluntary termination" within the meaning of ORS 657.176(2)). Therefore, under these circumstances, a discharge that resulted from claimant's failure to pay union dues constitutes a discharge for the violation of normal employment standards within the meaning of OAR 436-60-030(11)(b).

■ Next, we must determine whether the Board's finding that employer fired claimant for failing to pay his union dues is supported by substantial evidence. Claimant points to the Board's finding that he had caught up his payment of dues before employer terminated his employment and characterizes the termination as a "mistake," because he "was *not* in violation of any normal employment standard on the day he was discharged." (Emphasis in original.) Employer responds in its brief to this court:

> "The fundamental flaw in [claimant's] argument is that [OAR 436-60-030(11)(b)] does not require claimant to be in violation of a normal employment standard 'on the day he was discharged.' It requires that claimant be terminated '*for* violation of normal employment standards.' In other words, the violation of normal employment standards must have caused the termination.

"Claimant's failure to pay union dues was a violation of a normal employment standard and that violation caused his termination. Employer's action in terminating claimant's employment was dictated by the labor agreement between it and claimant's union. Employer had no choice but to terminate claimant's employment when it received the union's demand. The union did not authorize employer to employ claimant again until after the termination had occurred.

"Claimant's actions between the time of the union's two notices did not affect employer's reason for terminating claimant. They could not have. They were unknown to employer until after the termination. The Board's finding that claimant was terminated as required by the labor agreement for violation of a normal employment standard is supported by substantial evidence, and its conclusion based on its findings is reasonable." (Emphasis in original.)

We agree with employer. The Board found that the discharge was the result of claimant's conduct and not the result of a "mistake" by employer. Claimant does not dispute the finding that he initially fell in arrears in the payment of his union dues and that he failed to abide by his agreement to catch up. The information in the first letter from the business manager to employer was accurate at the time that the letter was written. Although it was not required to do so, employer contacted the appropriate union representative and verified that the information in the letter was accurate. Claimant had violated a normal employment standard at that point in time, and that is the reason for which employer discharged claimant. There is no "mistake" about that fact. Claimant's subsequent payment of his union assessments did not nullify the fact that an earlier violation of an employment standard had occurred.[6] Thus, the Board's finding that employer fired claimant as a direct consequence of his failure to pay his

---

[6] The dissent compares this case with a case in which a business agent sends a false notice to the employer that the claimant is in arrears and the employer then proceeds to terminate the claimant. It asserts that termination occurred in this case because of "incomplete information through no fault of claimant." 153 Or App at 246. That analysis glosses over the uncontroverted fact that claimant was in arrears in his union dues when the union sent notification of the arrearage to employer. The violation of normal employment standards occurred when claimant did not pay his dues in a timely manner as required by his union.

union dues is supported by substantial evidence in the record. It follows that the Board did not err when it applied OAR 436-60-030(11)(b) as a ground on which to deny TDD benefits to claimant.

Affirmed.

**ARMSTRONG, J.,** dissenting.

Because I disagree with the majority's conclusion that, under the specific facts of this case, there was substantial evidence for the Board to have found that claimant was fired for violating a normal employment standard, I respectfully dissent.

The majority errs, I believe, when it agrees with employer that it was irrelevant whether, at the time of the firing, claimant was in violation of a normal employment standard. Quoting from employer's brief, the majority states: " 'Claimant's actions between the time of the union's two notices did not affect employer's reason for terminating claimant. * * * They were unknown to employer until after the termination.' " 153 Or App at 244. Employer did not receive the first notice from the union until *after* claimant had become current in his union obligations, however, even though the notice had been sent before claimant had made his payment. Hence, at *all* times that employer was involved, claimant was in compliance with the union's dues requirements.

The majority states that employer's action nevertheless was valid because claimant *had* violated his agreement with the union at one time, and that, under *its* agreement with the union, employer had no choice but to comply with the union's request to fire claimant. If that were the case, however, it seems strange that employer would have called the union to confirm claimant's status before firing him. I believe that it is logical to assume that, had employer received correct information from the union's business agent, and had it known that claimant was in good standing with the union, employer would not have fired claimant.

The problem in this case is that the union's left hand did not know what its right hand had been doing. Had the information been channeled properly, the union's business

agent would have been able to inform employer on December 21 that claimant had made the payment due under his agreement with the union and that employer should, therefore, disregard the letter requesting termination. The union's letter of December 22, notifying employer of claimant's compliance with his agreement, was the standard notification letter, but the union business manager added a handwritten acknowledgment that the termination letter had been sent in error. The note read: "Arrangements had already been made between Chet [the business manager] and Mike [claimant]. Removal was sent in error." That letter can only be read as an admission by the union that claimant had not been in violation of a normal workplace standard at the time of the termination. Neither the Board nor the majority addresses that aspect of the letter in their respective opinions, and that, I believe, is where their error lies. This is not a case where a claimant fulfills an obligation only after he has been terminated for failing to act on the obligation and then asks for reinstatement. Rather, this is a case where claimant was terminated because the parties involved were working with incomplete information through no fault of claimant.

In other words, the facts establish that claimant was not terminated for violating a normal employment standard. He was terminated because the union had misinformed employer that he had. In fact, this case is legally indistinguishable from one in which the business agent, for purely malicious reasons, sends a false notice to employer that claimant is in arrears in his union dues and then confirms that status when called by employer, which proceeds to terminate claimant. According to the majority's analysis, claimant would be ineligible to receive TTD benefits on those facts because it does not matter whether claimant has, in fact, violated normal employment standards, but only whether employer has terminated him on the belief that he has. *Former* OAR 436-60-030(11)(b) cannot be understood to operate that way. Hence, the majority errs in concluding that substantial evidence supports the Board's finding that employer terminated claimant for violating a normal employment standard.

For the foregoing reasons, I respectfully dissent.